# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

PEDRO R. DUARTE,

     Petitioner

v.

BRIAN WILLIAMS, *et al.*,

     Respondents

Case No.: 2:12-cv-01305-JAD-EJY

**Order Denying Second Amended
Petition for Writ of Habeas Corpus**

[ECF No. 47]

     Petitioner Pedro R. Duarte was found guilty of conspiracy to commit robbery, attempted murder, attempted robbery, and possession of a stolen vehicle in Nevada State Court. Duarte seeks a writ of habeas corpus under 28 U.S.C. § 2254, based primarily on ineffective-assistance-of-counsel claims.[1] Having reviewed Duarte's claims on their merits, I find that habeas relief is not warranted, so I deny Duarte's petition, deny him a certificate of appealability, and close this case.

### Background

     Duarte's conviction arises from a series of robberies in Las Vegas that left two armored-truck drivers shot. As a result of the conspiracy between Duarte and Jose Manual Vigoa, Oscar Cisneros, and Luis Suarez, the MGM Grand Hotel, Desert Inn Hotel, Mandalay Bay Hotel, a Ross Dress for Less, and the Bellagio Hotel were all robbed.

     Duarte was charged with the events surrounding the June 28, 1999, Desert Inn Hotel robbery.[2] That day, Vigoa and Cisneros waited in some bushes outside of the Desert Inn Hotel,

---

[1] ECF No. 47.

[2] Ex. 2, ECF No. 25-2 at 2; Ex. 3, ECF No. 25-3 at 2.

and when armored guards arrived to pick up the hotel's deposits, Vigoa and Cisneros fired several rounds at the guards. Both guards were shot, but they were able to get back into their truck before any robbery could take place. Cisneros and Vigoa jumped into a stolen Isuzu Rodeo, allegedly driven by Duarte, and drove to the Vagabond Inn, where an eyewitness saw three Hispanic males exit the Isuzu Rodeo. The three conspirators entered another vehicle and left the Vagabond Inn. The physical evidence against Duarte was limited to DNA evidence found on an Arrowhead water bottle in the Isuzu Rodeo and fingerprints found on a stolen California license plate that was attached to Duarte's red Nissan pickup truck, which was parked at the Vagabond Inn.[3]

In July 2003, a jury in Nevada's Eighth Judicial District, Clark County, Nevada, convicted Duarte of conspiracy to commit robbery, attempted murder (two counts), attempted robbery (three counts), and possession of a stolen vehicle.[4] The Nevada Supreme Court affirmed Duarte's conviction.[5]

Duarte filed a pro se habeas petition in state court.[6] His counsel filed a supplemental petition on his behalf.[7] The state district court denied the petition,[8] and Duarte appealed.[9] The

---

[3] Ex. 2, ECF No. 25-2 at 3–4, 50, 52–55; Ex. 50, ECF No. 49-1 at 135–36.

[4] Ex. 4, 6, ECF No. 25-3.

[5] Ex. 11, ECF No. 25-4.

[6] Ex. 13, ECF No. 25-4.

[7] Ex. 15, ECF No. 26-1.

[8] Ex. 17, 18, ECF No. 26-1.

[9] Ex. 19, ECF No. 26-1.

Nevada Supreme Court affirmed in part, reversed in part and remanded for an evidentiary hearing on Duarte's claims that his trial counsel was ineffective for failing to investigate and call witnesses.[10] Two days before the Nevada Supreme Court's remand order, Duarte filed a second, self-titled successive habeas petition in state court.[11] Duarte's counsel filed an amended supplemental petition on Duarte's behalf.[12]

The state district court held evidentiary hearings on Duarte's remanded ineffective-assistance-of-counsel claims[13] but ultimately denied Duarte's amended habeas petition because he failed to show that his counsel's performance was ineffective.[14] The Nevada Supreme Court affirmed, concluding that Duarte's second habeas petition did not relate back to his original petition, was beyond the scope of the remand order, and was therefore a separate, independent matter still pending in the state district court.[15] The state district court dismissed Duarte's second post-conviction petition as successive and time barred under NRS 34.726 and NRS 34.810(2).[16] The Nevada Supreme Court affirmed.[17]

---

[10] Ex. 24, ECF No. 26-2.

[11] Ex. 22, ECF No. 26-2.

[12] Ex. 29, ECF No. 26-3.

[13] Ex. 31, ECF No. 26-3; Ex. 32, ECF No. 26-4.

[14] Ex. 32, ECF No. 26-4; Ex. 34, ECF No. 26-4.

[15] Ex. 35, ECF No. 26-4.

[16] Ex. 37, ECF No. 26-4.

[17] Ex. 80, ECF No. 49-31.

On July 17, 2012, Duarte dispatched his federal habeas petition.[18] Duarte later filed a statement of additional claims[19] and an amended petition.[20] The respondents moved to dismiss;[21] I denied the motion and appointed the Federal Public Defender to represent Duarte.[22] The Federal Public Defender then filed a second-amended petition, which asserts the following grounds for relief:

1. Law enforcement's DNA testing of the Arrowhead water bottle destroyed that evidence which prevented him from retesting it.

2. The state district court admitted Duarte's statements to law enforcement which were made under custodial conditions despite his invocations of his right to counsel.

3. There was no finding that Duarte harbored a specific intent to kill.

4. Duarte's trial counsel was ineffective because

   a. Duarte's trial counsel failed to conduct an adequate pretrial investigation and call witnesses at trial;

   b. Duarte's trial counsel failed to conduct an independent test of the Arrowhead water bottle;

   c. Duarte's trial counsel failed to obtain and present expert witness testimony;

   d. Duarte's trial counsel failed to move for a mistrial due to the presence of SERT guards and the fact that the jury witnessed Duarte being handcuffed; and

   e. Duarte's trial counsel failed to challenge erroneous jury instructions.

5. Duarte's appellate counsel was ineffective because

---

[18] ECF No. 9.

[19] ECF No. 10.

[20] ECF No. 17.

[21] ECF No. 24.

[22] ECF No. 39.

a.   Duarte's appellate counsel failed to raise an issue that his trial was rendered fundamentally unfair by the presence of SERT guards and the fact that the jury witnessed Duarte being handcuffed.

b.   Duarte's appellate counsel failed to raise a *Batson* issue.

c.   Duarte's appellate counsel failed to challenge the aiding and abetting and conspiracy mens rea jury instruction.[23]

The respondents moved to dismiss Duarte's second-amended petition.[24]   After I denied that motion,[25] the respondents filed an answer to the second amended petition,[26] and Duarte filed a reply.[27]   I now consider this fully briefed petition on its merits.

## Discussion

**A.   Evaluating habeas petitions under the Antiterrorism and Effective Death Penalty Act (AEDPA)**

If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[28]   A state court acts contrary to clearly established federal law if it

---

[23] ECF No. 47.

[24] ECF No. 58.  This filing was incorrectly filed as an answer to the amended petition.

[25] ECF No. 68.

[26] ECF No. 74.

[27] ECF No. 84.

[28] 28 U.S.C. § 2254(d).

applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[29]  And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[30]  Section 2254 does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[31]  The "objectively unreasonable" standard is difficult to satisfy;[32] "even 'clear error' will not suffice."[33]

Habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[34] As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[35]  "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under

---

[29] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[30] *White v. Woodall*, 572 U.S. 415, 425–27 (2014).

[31] *Id.* at 425–26.

[32] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[33] *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (citation omitted).  *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

[34] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

[35] *Id.* at 103.

Section 2254(d) is precluded.[36] AEDPA "thus imposes a 'highly deferential standard for evaluating state-court ruling,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"[37]

If a federal district court finds that the state court committed an error under § 2254, the district court must then review the claim de novo.[38] The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief,[39] but state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[40]

**B.    Evaluating Duarte's Claims**

*1.    Ground 1*

In Ground 1, Duarte claims that his federal constitutional rights were violated when law enforcement's DNA testing of a water bottle destroyed that evidence and prevented Duarte from retesting it. Duarte argues that the State's crime-scene analyst acted in bad faith when he used a fluid-testing procedure that destroyed any remaining DNA instead of swabbing the mouthpiece of the water bottle.[41] The respondents argue that Duarte has not shown that the evidence is clearly exculpatory or that there was no DNA remaining.[42]

---

[36] *Id.* at 101.

[37] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

[38] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[39] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[40] 28 U.S.C. § 2254(e)(1) (1996).

[41] ECF No. 47 at 17–18.

[42] ECF No 74 at 7, 10.

This ground was raised in Duarte's direct appeal.[43]  The Nevada Supreme Court held that Duarte did not suffer a due-process violation:

> Here, the DNA evidence may have been destroyed when the saliva from the water bottle mouthpiece was recovered by submerging the mouthpiece in fluid, leaving little or no saliva on the bottle for independent testing.  However, we conclude Duarte has failed to demonstrate bad faith by the State.  The DNA expert who recovered the saliva testified that submerging the mouthpiece in fluid was the most effective DNA extraction method.  Furthermore, the PCR test, the manner of DNA testing used by the State's expert, has been shown to be "reliable and trustworthy for use within the forensic context;" therefore, DNA results obtained through this technique have been held to be admissible.

> Likewise, Duarte has failed to establish any prejudice given the reliability of the testing coupled with Duarte's failure to retest the bottle to confirm the lack of any DNA evidence.  Even if DNA was not present on the mouthpiece, the State's expert froze the remaining cells obtained from the mouthpiece.  Duarte could have independently tested the remaining cells and had the opportunity to challenge the State's expert regarding the DNA testing methods.

> The water bottle, the State's raw data and frozen cells were made available to Duarte.  The testing method used is standard procedure in Nevada and has been reviewed for accuracy and reliability.  Under these facts, we conclude that Duarte was given a meaningful opportunity to present a complete defense, and Duarte's due process rights were not violated.[44]

I find that this ruling was reasonable.  Duarte moved for independent DNA testing of the water bottle.  The state district court granted that motion.  On the morning of the first day of trial, Duarte filed a motion requesting that the water bottle DNA be suppressed because "there was no DNA preserved on the Arrowhead water bottle," making retesting impossible.  The state district

---

[43] *See* Ex. 9, ECF No. 25-3 at 81.

[44] Ex. 11, ECF No. 25-4 at 35–36.

court heard oral argument on the motion and denied it, concluding that "there hasn't been any showing that there was any deliberate destruction of evidence in this case, and what was removed was available for retesting or reanalysis by [Duarte's] expert."[45]

Thomas Wahl, a Criminalist 2, DNA Analyst with the Las Vegas Metropolitan Police Department, was asked to do a DNA analysis of four water bottles regarding a robbery incident that took place at the Desert Inn Hotel on June 28, 1999.  One of the water bottles that he analyzed was an Arrowhead water bottle found in the back of an Isuzu Rodeo.  The DNA profile that Wahl obtained from the water bottle "was rarer than 1 in 600 billion," so he "attribute[ed] the source of the DNA on the water bottle to Pedro Duarte."[46]  Wahl testified about the DNA extraction method that he used on the water bottle:

> [D]rinking receptacles, whether they be cups or glasses or beer cans or beer bottles, the success rate is fairly low with obtaining genetic information from these items.  That doesn't mean you can't, but more often than not we're unsuccessful in getting any type of DNA information.
>
> It's been my experience, however, that with water bottles that have these snap tops where you snap it up to open it and close it that I have a higher success rate of getting DNA typing results from these types of bottles in that my opinion is that cells get trapped up in the inside, in the recesses of this little bottle, and so I need to try to get the cells out of those recesses.
>
> I found the most effective way to do that is to actually submerse - - open the bottle up and submerse the bottle in a - - in a test tube, sterile test tube with some sterile buffer solution and just try to wash the cells out - - off the surface of the bottle.[47]
> It's been my experience, particularly with those type of mouthpieces, that to get the most efficient recovery of cells from

---

[45] Ex. 45, ECF No. 48-6 at 8, 10, 12.

[46] Ex. 50, ECF No. 49-1 at 113, 120, 135–36.

[47] Id. at 140–41.

9

that I submerse it in the PVS. On all drinking devices, glasses, bottles, these types of mouthpieces, there's no way by visually observing the rim of these drinking cups or bottles that I can ascertain whether or not there are even any cells present. It's not like a bloodstain or a semen stain where I can actually visualize it and see it and then I can make a very logical choice of how much of the stain I want to remove and leave sufficient for reanalysis. Drinking devices don't lend me that type of visual assessment.[48]

When asked whether it would be difficult to retest the DNA of the water bottle's mouthpiece after the submersion process, Wahl testified that "if there are not many cells remaining, you may not get any DNA information." Therefore, Wahl told Duarte's expert that she would probably not recover any cells from the water bottle in question. Wahl testified that it can be difficult to get a swab of a snap cap to extract DNA and that it is "a somewhat inefficient way of recovering cells." Wahl also testified that any unused DNA is retained and frozen for retesting and that the only way to have known whether there was any DNA left on the water bottle was to retest it.[49]

"Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness," so "criminal defendants [must] be afforded a meaningful opportunity to present a complete defense."[50] The State's loss or destruction of potentially exculpatory evidence violates due process only when the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other

---

[48] *Id.* at 153.

[49] *Id.* at 143, 149–50, 153–54.

[50] *California v. Trombetta*, 467 U.S. 479, 485 (1984).

reasonably available means."[51]  Moreover, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."[52]  "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."[53]  Even negligence in failing to preserve potentially useful evidence is not sufficient to constitute bad faith and does not violate due process.[54]

Duarte's argument that Wahl acted in bad faith by not swabbing the water bottle to extract the DNA cells is belied by the record.  Wahl explained on three occasions that submersion of the water bottle in the PVS is more efficient that swabbing.[55]  Further, "the police do not have a constitutional duty to perform any particular tests."[56]  Therefore, although swabbing the water bottle for DNA extraction may have left DNA for Duarte's expert to have tested, Wahl acted within his duties when he extracted the DNA through the submersion

---

[51] *Id.* at 489; *see also United States v. Bingham*, 653 F.3d 983, 994 (9th Cir. 2011).

[52] *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *see also Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004).

[53] *Youngblood*, 488 U.S. at 56 n.*.

[54] *Id.* at 58; *see also United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) ("Bad faith requires more than mere negligence or recklessness.").

[55] *See* Ex. 50, ECF No. 49-1 at 141 ("I found the most efficient way to [extract DNA from water bottles with snap tops] is to actually submerse"); at 153 ("to get the most efficient recovery of cells from [a water bottle mouthpiece,] I submerse it in the PVS"); at 153 (swabbing the snap cap of a water bottle to extract DNA is "a somewhat inefficient way of recovering cells").

[56] *Youngblood*, 488 U.S. at 59; *see also Mitchell v. Goldsmith*, 878 F.2d 319, 322 (9th Cir. 1989) (explaining that the State has "no constitutional duty to perform any particular test").

1  process.[57]  Accordingly, the Nevada Supreme Court's ruling was not contrary to, or an

2  unreasonable application of, clearly established federal law as determined by the Supreme Court,

3  and it was not based on an unreasonable determination of the facts in light of the evidence.[58]

4  Ground I is denied.

5      *2.*  ***Ground 2***

6      In Ground 2, Duarte claims that his federal constitutional rights were violated when the

7  state district court admitted his statements to law enforcement despite his repeated and

8  unequivocal invocations of the right to counsel.  Duarte claims that law enforcement

9  constructively placed him in custody by imposing significant restrictions on his freedom and

10  creating a police-dominated atmosphere.[59]  The respondents argue that because Duarte's

11  statements were noncustodial, there was no *Miranda* violation.[60]

12      This ground was raised in Duarte's direct appeal,[61] and the Nevada Supreme Court held

13  that the interview did not implicate Duarte's Fifth Amendment rights:

14          In this case, the initial interview was held outside Duarte's home,
             with police questioning Duarte about his truck that he had reported
15          stolen.  Duarte's alleged stolen truck was found in the same hotel
             parking lot where the getaway vehicle was abandoned. Both
16          vehicles were "cold plated" whereby licenses plates belonging to

17

18  [57] Duarte also argues that Nevada law employs more rigorous safeguards than the federal
     minimum surrounding the preservation of evidence. ECF No. 84 at 47.  To the extent that
19  Duarte claims that the state district court's admission of the DNA evidence violated Nevada state
     law, he fails to state a cognizable federal habeas claim. *See Estelle v. McGuire*, 502 U.S. 62, 63
20  (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations
     on state-law questions.").

21  [58] *See* 28 U.S.C. § 2254(d) (1996).

22  [59] ECF No. 47 at 19–20.

23  [60] ECF No. 74 at 11.

    [61] *See* Ex. 9, ECF No. 25-3 at 96–102.

other vehicles were fastened over the top of the vehicles' actual
licenses plates. Although the conversation became hostile, there is
no evidence that Duarte was in any way restrained. The second
interview, a few hours after the first, occurred after Duarte
voluntarily went to the police station. After the interview, Duarte
left without hindrance, and there is no evidence that Duarte's
freedom was restrained during the interview.

A review of the "totality of the circumstances" test pursuant to
*Taylor* suggests there was no custodial interrogation. The sites of
the interrogation were Duarte's home and a police station.
However, the State used no evidence from the first interview during
the trial. The second interview, occurring at the stationhouse, was
voluntary, and Duarte presented no evidence that his freedom was
restricted, particularly since he left the station to meet his family
after the interview. Consistent with the facts in *Mathiason*, Duarte
was not in custody during the second interview.
. . .
The record does not indicate Duarte was told the questioning was
voluntary. Duarte was not formally under arrest at the time of
questioning; however, during the initial interview, the police
threatened to take him downtown for questioning. Duarte did not
present any evidence that he was handcuffed or restrained and could
not move about. The questioning officers never told Duarte he was
not free to leave, and after the second interview, Duarte freely
walked out of the police station. The second interview was clearly
voluntary, as Duarte went to the station freely to answer questions,
and the detective indicated he was cooperative during the interview.
Both interviews occurred with police; however, Duarte does not
point to any evidence that the interviews were "police-dominated."
At the conclusion of questioning, police did not arrest Duarte.

Under these facts, we conclude that Duarte was not in custody for
purposes of *Miranda*, and the police questioning did not implicate
his Fifth Amendment rights.[62]

I find that this ruling of the Nevada Supreme Court was reasonable. Duarte's trial

counsel moved to suppress Duarte's statements, but that motion was denied.[63] Counsel

explained at oral argument that during the detectives' questioning of Duarte at his home, they

---

[62] ECF No. 25-4 at 39–41.

[63] Ex. 45, ECF No. 48-6 at 4, 7.

13

indicated that "if [Duarte] did not cooperate[,] they were going to handcuff him and bring him down to the police station for further questioning."[64]  Duarte "ask[ed] for counsel at least three to four times during" this interview.[65]  The officers also "told [Duarte] that if he didn't cooperate[,] he wasn't [going to] get his . . . vehicle back."[66]  But none of Duarte's statements from this first interview at his house were introduced at trial.

The second interview that occurred later the same day, however, was discussed in-depth at Duarte's trial through the testimony of Detective Lazaro Chavez of the Las Vegas Metropolitan Police Department.  Detective Chavez testified that he helped interview Duarte on June 29, 1999, at the Metropolitan Police Department because he spoke Spanish and would be able to assist in the interview of Duarte, who also spoke Spanish.[67]  During the interview, which lasted approximately one hour, Duarte was not read his *Miranda* rights, was not told that he had a right to speak to an attorney, and was not told that he could leave.[68]  Duarte was not advised that "he was a suspect or a target," and he "came in of his own free will to talk to" the detectives.[69]  Following the interview, Duarte "went home with his wife."[70]

---

[64] *Id.* at 5.

[65] *Id.*

[66] *Id.* at 6.

[67] Ex. 48, ECF No. 48-9 at 130–31, 155.

[68] *Id.* at 155; Ex. 49, ECF No. 49 at 30.

[69] Ex. 48, ECF No. 48-9 at 160.

[70] *Id.* at 162.

Duarte mentioned a lawyer twice during this second interview at the police station. Following a question about whether Duarte would take a polygraph test, Duarte said that he preferred to have an attorney:

> I tell you I am not a citizen and I know a little bit about my rights, okay, and, since I don't know the laws, I prefer an attorney, do you understand me, an attorney because I see that you are now involving me in a crime. Do you understand me? My car was found with a plate that supposedly was used or was going to be used. I don't know what happened.[71]

At that point, the detectives "didn't ask him any more questions about the polygraph test."[72] Later, "[t]owards the end of the interview[, Duarte] made mention that he thought he might need to speak to an attorney and soon thereafter [the detectives] stopped talking to him."[73] Duarte stated, "'I'm gonna need a lawyer from the court, a lawyer because (blank) a lawyer - - I'm going to need a lawyer to give me my rights.'"[74] Duarte made this statement after he was asked whether his fingerprints would be found in another vehicle.[75]

A defendant's "privilege against self-incrimination is jeopardized" when that defendant "is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning."[76] So, "the prosecution may not use statements, whether

---

[71] Ex. 49, ECF No. 49 at 39, 42.

[72] *Id.* at 53.

[73] Ex. 48, ECF No. 48-9 at 160.

[74] Ex. 49, ECF No. 49 at 20.

[75] *Id.* at 27–28.

[76] *Miranda v. Arizona*, 384 U.S. 436, 478 (1966).

exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[77]  If a defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking[,] there can be no questioning."[78]

Because Duarte was not read his *Miranda* rights, his statements are inadmissible if he was in custody at the time he made them.[79]  A "custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[80]  To determine whether a defendant is in custody for the purposes of *Miranda*, "a court must examine all the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with formal arrest."[81]  The court must also assess whether "given [the] circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."[82]  Relevant factors for a

---

[77] *Id.* at 444.

[78] *Id.* at 444–45; *see also Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) (holding that when an accused individual "expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police").

[79] *See Thompson v. Keohane*, 516 U.S. 99, 102 (1995) ("*Miranda* warnings are due only when a suspect interrogated by the police is 'in custody.'").

[80] *Miranda*, 384 U.S. at 444.

[81] *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation and citation omitted).

[82] *Thompson*, 516 U.S. at 112; *see also United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981) (explaining that the objective question is whether a "reasonable innocent person in such circumstances" would understand that he or she could refuse to answer officers' questions and leave).

court to consider in evaluating how a reasonable person would have gauged his "freedom of movement" include the location of the questioning, its duration, the statements made during the interview, the presence or absence of physical restraints during the questioning, and whether the interviewee was released at the end of the questioning.[83]

The location of Duarte's second interview was the police station.[84]  According to his trial counsel, Duarte was threatened during the first interview at his home that he would not get his vehicle back and would be handcuffed and brought to the police station if he did not cooperate.[85]  Although the police allegedly made verbal threats to Duarte, I do not find that he was compelled to go to the police station.  He was not physically brought to the police station to be interrogated, but, rather, according to the detective, he "came in of his own free will to talk to us."[86]  Next, the interview lasted approximately one hour,[87] and it does not appear from the record that Duarte was physically restrained during the interview.  Duarte was also free to leave after the interview concluded.[88]

Based primarily on the fact that Duarte voluntarily went to the police station and left at the conclusion of the interview, I conclude that there was no restraint on Duarte's freedom of movement and that a reasonable person in the same circumstances as Duarte would have

---

[83] *Howes v. Fields*, 565 U.S. 499, 509 (2012).

[84] Ex. 48, ECF No. 48-9 at 155.

[85] Ex. 45, ECF No. 48-6 at 5, 6.

[86] Ex. 48, ECF No. 48-9 at 160.

[87] Ex. 49, ECF No. 49 at 30.

[88] Ex. 48, ECF No. 48-9 at 162.

understood that he was "at liberty to terminate the interrogation and leave."[89]  Accordingly, I conclude that Duarte was not in custody during his interview at the police station, so the statements that he made to detectives were admissible.[90]  At a minimum, fair-minded jurists could at least disagree on the question, which is enough to preclude habeas relief.[91]  Thus, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, nor was it based on an unreasonable determination of the facts in light of the evidence.[92]  Ground 2 is denied.

### 3.    Grounds 3, 4e, and 5c[93]

In Ground 3, Duarte claims that his federal constitutional rights were violated when the state district court allowed the jury to convict him of attempted murder without finding that he harbored a specific intent to kill.  He contends that jury instruction 18, the instruction on aiding and abetting, unduly expanded the scope of liability for aiding and abetting by eliminating the State's burden of proving the requisite mens rea for attempted murder and allowing the jury to convict him for any reasonably foreseeable act of the conspiracy.  Relatedly, in Grounds 4e and

---

[89] *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

[90] *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (holding that the defendant was not in custody because "[h]e came voluntarily to the police station, where he was immediately informed that he was not under arrest[, and a]t the close of a ½-hour interview [the defendant] did in fact leave the police station without hindrance").

[91] *See Dyer v. Hornbeck*, 706 F.3d 1134, 1139 (9th Cir. 2013) (denying habeas relief based on the conclusion that "fairminded jurists could, on this record, find that Dyer was not in custody, because many presumably fairminded jurists have indeed so found on facts similar to these").

[92] *See* 28 U.S.C. § 2254(d) (1996).

[93] I previously determined that these three grounds related back to Duarte's timely filed statement of additional claims.  ECF No. 68 at 7.

5c, Duarte claims that his federal constitutional rights were violated when his trial counsel failed to challenge the aiding-and-abetting-liability instruction and when his appellate counsel failed to include a ground involving that instruction on direct appeal.[94]  The respondents argue that there was no due-process violation because the instructions taken as a whole were adequate to inform the jury of the elements of attempted murder.  They add that there was sufficient evidence presented at the trial for the jury to have found specific intent as Duarte must have known that in order to rob an armored truck with armed guards, the plan must be to kill the guards if necessary.[95]

In my August 23, 2016, order, I explained that these grounds—3, 4e, and 5c—were first raised by Duarte in state court in his second post-conviction petition.[96]  The Nevada Supreme Court affirmed the denial of that petition in its entirety, concluding that the petition was time-barred, it was successive, and Duarte failed to demonstrate good cause to overcome those procedural bars.[97]  Duarte contends that the procedural default should be excused because he received ineffective assistance of post-conviction counsel.[98]

To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural

---

[94] ECF No. 47 at 22–23, 31, 34.

[95] ECF No. 74 at 18.

[96] *See* ECF No. 68 at 7.

[97] *Id.*; *see also* Ex. 80; ECF No. 49-31 at 2–3.

[98] ECF No. 63 at 45.

rule.[99]  In *Martinez v. Ryan*, the United States Supreme Court held that ineffective assistance of post-conviction counsel may serve as cause to overcome the procedural default of a claim of ineffective assistance of trial counsel.[100]  The High Court noted that it had previously held, in *Coleman v. Thompson*,[101] that "an attorney's negligence in a postconviction proceeding does not establish cause" to excuse a procedural default; however, it "qualif[ied] *Coleman* by recognizing a narrow exception: [i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."[102]  The Court described "initial- review collateral proceedings" as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance of trial."[103]  Because the *Martinez* analysis is intertwined with the underlying merits of these grounds, I deferred ruling on the *Martinez* issue until the merits of these grounds were briefed by the parties.[104]  I now determine that these grounds are not substantial and lack merit.

---

[99] *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also McCleskey v. Zant*, 499 U.S. 467, 497 (1991) ("For cause to exist, the external impediment . . . must have prevented [the] petitioner from raising the claim."); *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) ("To establish prejudice resulting from a procedural default, a habeas petitioner bears 'the burden of showing not merely that the errors [complained of] constituted a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." (emphases in original), citing *United States v. Frady*, 456 U.S. 152, 170 (1982)).

[100] *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).

[101] *Coleman v. Thompson*, 501 U.S. 722 (1991), holding modified by *Martinez*, 566 U.S. at 132.

[102] *Id.* at 1315, 1319.

[103] *Id.*

[104] ECF No. 68 at 8.

Although he primarily challenges jury instruction 18, Duarte also takes issue with instructions 15 and 16. Jury instruction 15 provided that: "Where several parties join together in a common design to commit any lawful act, each is criminally responsible for the acts of his confederates committed in furtherance of the common design. In contemplation of law, the act of one is the act of all." Instruction 16 provided that:

> Where the purpose of the conspiracy is to commit a dangerous felony[,] each member runs the risk of having the venture end in homicide or attempt murder, even if he has forbidden the others to make use of deadly force. Hence each is guilty of attempt murder if one of them commits that crime in the perpetration of an agreed-upon robbery.

Instruction 18 read that "A co-conspirator and/or an aider or abetter is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonable offense committed by the co-conspirator and/or the person he aids and abets."[105]

Because Duarte claims that these instructions violated his due-process rights regarding his attempted murder convictions, I consider them in conjunction with the attempted murder instructions. Instruction 21 read, "Attempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill."[106] And instruction 22 explained that "The elements of an attempt to commit murder are: 1) the intent to commit the murder; 2) performance of some act towards its commission; and 3) failure to consummate its commission."[107] During

---

[105] Ex. 53, ECF No. 84-1 at 20–21, 23.

[106] *Id.* at 27.

[107] *Id.* at 28.

deliberations, the jury asked, "Regarding Instruction Number 22, do all three elements have to apply, or only one, two?" The trial judge responded: "yes, all three elements have to apply."[108]

Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process.[109] The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'"[110] When reviewing a jury instruction, the court inquires "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation."[111] And jurors are presumed to follow the instructions that they are given.[112] Even if an instruction contains a constitutional error, the court must then "apply the harmless-error analysis mandated by *Brecht*[ *v. Abrahamson*, 507 U.S. 619 (1993)]."[113] The question is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict."[114]

---

[108] Ex. 52, ECF No. 49-3 at 5.

[109] *Estelle v. McGuire,* 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error.").

[110] *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)).

[111] *United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999) (internal citations omitted); *see also Estelle*, 502 U.S. at 72 (explaining that a challenged instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record" (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973))).

[112] *United States v. Olano*, 507 U.S. 725, 740 (1993).

[113] *Calderon v. Coleman,* 525 U.S. 141, 146 (1998).

[114] *Id.* at 145.

Prior to Duarte's trial, "aiders and abettors [we]re criminally responsible for all harms that [we]re a natural, probable, and foreseeable result of their actions."[115]  But less than a year before Duarte's conviction, the Nevada Supreme Court in *Sharma v. State* stepped back from this rule and narrowed the definition of aiding and abetting, holding that "in order for a person to be held accountable for the specific intent crime of another under an aiding or abetting theory of principal liability, the aider or abettor must have knowingly aided the other person with the intent that the other person commit the charged crime."[116]  Then, approximately two years after Duarte's trial, the Nevada Supreme Court held in *Bolden v. State* that "a defendant may not be held criminally liable for the specific intent crime committed by a coconspirator simply because that crime was a natural and probable consequence of the object of the conspiracy."[117]

Attempted murder is a specific intent crime,[118] so the *Sharma* and *Bolden* holdings are applicable.  The heart of Duarte's argument is that due-process rights are violated if a jury instruction "ha[s] the effect of relieving the State of the burden of proof . . . on the critical question of petitioner's state of mind."[119]  There appears to be no dispute that the "reasonably

---

[115] *Mitchell v. State*, 971 P.2d 813, 820 (Nev. 1998), *overruled in relevant part by Sharma v. State*, 56 P.3d 868, 872 (Nev. 2002).

[116] *Sharma*, 56 P.3d at 872.

[117] *Bolden v. State*, 124 P.3d 191, 200–01 (Nev. 2005), *overruled on other grounds by Cortinas v. State*, 195 P.3d 315, 324 (Nev. 2008).

[118] *See Keys v. State*, 766 P.2d 270, 273 (Nev. 1988) ("Attempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill.").

[119] *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979); *see also In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."); *Evanchyk v. Stewart*, 340 F.3d 933, 939 (9th Cir. 2003) ("It is a violation of due process for a jury instruction to omit an element of the crime.").

foreseeable offense" language used in jury instruction 18 was erroneous because it used pre-*Sharma* and pre-*Bolden* terminology.

But when analyzed as a whole, the instructions did not run afoul of *Sharma* and *Bolden* by eliminating the requirement that the jury find that Duarte had the specific intent to kill someone. There was no single instruction detailing the elements needed to prove attempted murder based on an aiding-and-abetting theory of criminal liability under *Sharma* or attempted murder based on vicarious co-conspirator liability under *Bolden*.[120] So the aiding-and-abetting and conspiracy instructions—15, 16, and 18—must be read together with the attempted murder instructions—21, 22.[121] The attempted murder instructions—instructions 21 and 22—both highlight the fact that a specific intent to kill must be found: jury instruction 21 provides that " . . . with the deliberate intention unlawfully to kill" and jury instruction 22 ". . . the intent to commit the murder . . . ."[122] Because the jury was instructed that they were required to find that Duarte harbored a specific intent to kill in order to find him guilty of attempted murder,[123] I

---

[120] *See Sharma*, 56 P.3d at 874 (offering the following as an instruction example for attempted murder based on an aiding and abetting theory of criminal liability: "In order to find the defendant guilty of attempted murder, the State must prove beyond a reasonable doubt that . . . with the deliberate intention to unlawfully kill the victim, the defendant aided, abetted, counseled, or encouraged another person to kill the victim and that other person committed an act that tended, but failed to kill the victim").

[121] *See United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999); *see also Estelle*, 502 U.S. at 72.

[122] Ex. 53, ECF No. 84-1 at 27–28.

[123] Duarte argues that, like the Nevada Supreme Court in *Sharma*, I should deny the State's attempt to "cobble together other jury instructions to remedy the deficiency." *See* ECF No. 84 at 24. However, the other jury instructions that the State attempted to use in *Sharma* did not contain the requisite level of intent: the specific intent to kill. *See Sharma*, 56 P.3d at 873. That is not the case here: jury instructions 21 and 22 both contained the specific intent to kill language. *See* Ex. 53, ECF No. 84-1 at 27–28.

cannot conclude that jury instruction 18, although erroneous, "so infected the entire trial that the resulting conviction violates due process."[124]

I now turn to ground 4e, Duarte's argument that his trial counsel failed to challenge the aiding and abetting instruction. The right to counsel embodied in the Sixth Amendment provides "the right to the effective assistance of counsel."[125] Counsel can "deprive a defendant of the right to effective assistance[] simply by failing to render 'adequate legal assistance[.]'"[126] In the hallmark case of *Strickland v. Washington*, the United States Supreme Court held that an ineffective-assistance claim requires a petitioner to show that: (1) his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all of the circumstances of the particular case;[127] and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.[128] A reasonable probability is "probability sufficient to undermine confidence in the outcome."[129] Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of hindsight.[130] "The question is whether an attorney's representation amounted to incompetence under prevailing

---

[124] *See Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

[125] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[126] *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 335–36 (1980)).

[127] *Strickland*, 466 U.S. at 690.

[128] *Id.* at 694.

[129] *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

[130] *Strickland*, 466 U.S. at 689.

professional norms, not whether it deviated from best practice or most common custom."[131]  The

burden is on the petitioner to overcome the presumption that counsel made sound trial-strategy

decisions.[132]

The United States Supreme Court has described federal review of a state supreme court's

decision on an ineffective-assistance claim as "doubly deferential."[133]  So, I "take a 'highly

deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'"[134]

And I consider only the record that was before the state court that adjudicated the claim on its

merits.[135]

As I have addressed, there does not appear to be a dispute that the "reasonably

foreseeable offense" language used in jury instruction 18 is erroneous. Although the *Bolden*

opinion was not yet decided at the time of Duarte's trial, the Nevada Supreme Court's opinion in

*Sharma* was released almost a year before Duarte's conviction.  Therefore, as jury instruction 18

incorrectly uses the "reasonably foreseeable" language that was abolished in *Sharma*, I conclude

that Duarte's trial counsel's failure to challenge the instruction "fell below an objective standard

of reasonableness."[136]  But Duarte fails to satisfy the second prong of *Strickland* because he has

not demonstrated that the result of his trial would have been different had his trial counsel

---

[131] *Harrington v. Richter*, 562 U.S. 86, 104 (2011).

[132] *Id.*

[133] *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)(quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

[134] *Id.*

[135] *Id.* at 181–84.

[136] *See Strickland v. Washington*, 466 U.S. 668, 688 (1984).

challenged the instruction.[137]  Indeed, because jury instructions 21 and 22 properly required a finding that Duarte possessed the specific intent to kill, he cannot satisfy *Strickland*'s second prong.

In ground 5c, Duarte claims that his appellate counsel failed to include a ground involving the aiding-and-abetting jury instruction on direct appeal, so Duarte "must first show that his counsel was objectively unreasonable . . . in failing to find arguable issues on appeal— that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them."[138]  If Duarte meets that burden, "he then has the burden of demonstrating prejudice.  That is, he must show a reasonable probability that, but for counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal."[139]  Because the jury instructions read as a whole did not violate Duarte's due-process rights, and Duarte was not prejudiced by his trial counsel's failure to challenge the aiding-and-abetting jury instruction, I find that Duarte's appellate counsel was not "objectively unreasonable" for omitting this argument from his direct appeal.[140]

Because Duarte has not shown that the aiding-and-abetting jury instruction violated his due-process rights or that his trial or appellate counsel were ineffective for failing to raise this argument at trial or on direct appeal, Grounds 3, 4e and 5c are not substantial.  Therefore, Duarte has not shown that his post-conviction counsel was ineffective for failing to raise these grounds.

---

[137] *Id.* at 694.

[138] *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

[139] *Id.*

[140] *Id.*

And because Duarte's post-conviction counsel was not ineffective, there is no cause for Duarte's procedural default.[141]  Accordingly, Grounds 3, 4e and 5c are denied as procedurally defaulted.[142]

### 4.  Ground 4a

In Ground 4a, Duarte claims that his federal constitutional rights were violated when his trial counsel failed to conduct an adequate pretrial investigation and call crucial witnesses at trial. Duarte explains that there was a discrepancy about where the Arrowhead water bottle containing his DNA was found and that his trial counsel should have investigated this discrepancy.  Further, Duarte argues that his trial counsel failed to investigate the testimony that Duarte's wife, now ex-wife, could have provided at his trial concerning phone calls that she made to her sister that were presented to the jury as being calls that Duarte made to Vigoa, Duarte's sister-in-law's husband. Finally, Duarte asserts that his trial counsel failed to investigate Vigoa, who provided a declaration after trial stating that Duarte was not involved in the robbery.[143]

This ground was raised in Duarte's state habeas appeal.[144]  The Nevada Supreme Court remanded for an evidentiary hearing:

---

[141] *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012) ("Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial.").

[142] Duarte also asserts that he can overcome a procedural default because he can establish that he is actually innocent of conspiring to, or aiding and abetting, attempted murder.  ECF No. 84 at 44–45.  To demonstrate actual innocence to overcome a procedural bar, a petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  Because Duarte has not provided any new evidence, this argument lacks merit.

[143] ECF No. 47 at 25–27.

[144] Ex. 20; 26-1 at 74.

> Based on the record before us, we are unable to conclude that Duarte's claim is sufficiently belied by the record to preclude an evidentiary hearing on the claims that counsel was ineffective for failing to investigate and call witnesses. Accordingly, we remand this case to the district court for an evidentiary hearing on Duarte's claims that counsel was ineffective for failing to investigate and call defense witnesses.[145]

The state district court conducted that evidentiary hearing and determined that the proposed witnesses lacked credibility and exculpatory value.[146] Duarte appealed.[147] The Nevada Supreme Court "conclude[d] that the district court's findings are supported by substantial evidence and not clearly wrong, and Duarte has not demonstrated that the district court erred as a matter of law. Therefore, we conclude that the district court did not err by rejecting Duarte's ineffective-assistance claims."[148]

I find that this ruling was reasonable. As to Duarte's counsel's alleged deficiency in not investigating the Arrowhead water bottle's location, Duarte explained:

> In a search warrant affidavit, Detective Sherwood makes reference to water bottles found in the bushes of the Desert Inn Casino suggesting the Arrowhead bottle was not found in the getaway vehicle. . . . One detective mentioned the bottle was discovered in the Desert Inn rosemary bushes that ringed the locale of the robbery. Analyst Morton also put the Arrowhead water bottle in an evidence bag that contained evidence taken from Duarte's nearby truck. This renders it possible that the Arrowhead bottle was actually in Duarte's truck thereby rendering the fact his DNA was on the bottle much less significant.[149]

---

[145] Ex. 24, ECF No. 26-2 at 89.

[146] *See* Ex. 35, ECF No. 26-4; Ex. 34, ECF No. 26-4 at 11–19.

[147] Ex. 33, ECF No. 26-4 at 5.

[148] Ex. 35, ECF No. 26-4 at 22.

[149] ECF No. 47 at 26.

Duarte provides no citations to any of these references. But even assuming these facts are true, they fail to support relief because Duarte does not demonstrate that his trial counsel was deficient. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[150] Instead of disputing where the Arrowhead water bottle was found, it appears that Duarte's trial counsel instead decided to combat the evidence by conducting his own DNA test of the water bottle, and when it was determined that there was probably no DNA left on the water bottle to test, moving to suppress the DNA evidence.[151] Because it was reasonable to have forgone one method of refuting the evidence in lieu of another method, I conclude that Duarte's trial counsel's "representation [did not] f[a]ll below an objective standard of reasonableness."[152]

Nor does the failure to call Vilma Farray, Duarte's ex-wife, as a witness merit relief. Farray testified at the post-conviction evidentiary hearing that although she failed to mention it during her testimony before the Grand Jury, she told Duarte's trial counsel that she had called her sister, the wife of Vigoa, both before and after the attempted robbery that took place at the Desert Inn Hotel.[153] Conversely, Duarte's trial counsel testified that he spoke to Farray quite regularly, but she never mentioned the phone calls with her sister.[154] Duarte's trial counsel further testified that he did not call Farray as a witness because he reviewed her grand jury

---

[150] *Strickland v. Washington*, 466 U.S. 668, 691 (1984).

[151] Ex. 45, ECF No. 48-6 at 8, 10.

[152] *Strickland*, 466 U.S. at 688.

[153] Ex. 31, ECF No. 26-3 at 87–88, 123.

[154] *Id.* at 59, 83.

testimony and "[n]othing during those conversations or any of the material that [he] had reviewed suggested to [him] that there was evidence to present that would exculpate [Duarte] or assist [him] in [his] defense."[155]  Coconspirator Suarez's trial counsel also testified at the post-conviction hearing and explained that he would not have called Farray to testify because she was not a credible witness:

> She had, from my prospective, real credibility problems. She had -
> - the police go interview Vilma after the arrest.  The arrests are quite
> eventful.  There's a car chase, people are getting taken into custody,
> you know, felony stops.  They then go back and interview her and
> she is as inappropriate as a person might be to the police officers and
> that gets referred to in the Grand Jury transcript.  So, when I go ask
> her what it is that was inappropriate and I hear, there's no chance
> I'm ever putting her on the stand.[156]

Although Farray testified that she informed Duarte's trial counsel about the phone calls made the day of the robbery being between her and her sister, that testimony is questionable. Farray did not inform the grand jury of this fact, and Duarte's trial counsel testified that Farray never mentioned this to him even though they spoke regularly.  And due to the inappropriate comments Farray made to the police when Duarte was arrested, it appears that it may have been a tactical decision not to call Farray, as she may not have been perceived well by the jury.[157]

Vigoa signed a declaration following Duarte's trial declaring that "Pedro Duarte was never involved in any thing [sic] that had to do with the Desert Inn attempted robbery.  They

---

[155] *Id.* at 61.

[156] *Id.* at 107.

[157] *See Minner v. Kerby*, 30 F.3d 1311, 1317 (10th Cir. 1994) ("[T]he decision of what witnesses to call is a tactical one within the trial counsel's discretion.").

threaten [sic] to charge my wife with felonies, so I plead to what they requested."[158]  Vigoa explained that "[t]he night before of [sic] the Desert Inn attempt of robbery, I asked Pedro if I can [sic] borrow his truck because mine was broken" and that "[i]n the Vagabond, I attached a license plate with rubber band [sic] in the back of Pedro's truck's original license plate."[159]  Although neither Duarte's trial counsel nor his investigator spoke to Vigoa in preparing for trial, he explained that he received "no evidence to suggest that [Vigoa's] testimony would assist in [Duarte's] defense," and he "never had any indication that [Vigoa] was going to testify or give evidence in defense of Mr. Duarte."[160]  Coconspirator Suarez's trial counsel testified that because Vigoa pled guilty prior to Duarte's trial, if Vigoa had been called as a witness at Duarte's trial, the State would have been able to impeach him with his 44 felony convictions.[161]  Co-conspirator Suarez's trial counsel also testified that because Vigoa had mentioned Duarte being involved in the MGM Grand Hotel robbery in an affidavit he signed during the plea process, the State would have been able to ask questions about that robbery.[162]

Duarte's trial counsel was never told that Vigoa would be able to provide exculpatory evidence, and importantly, it is unlikely that his testimony would have carried much, if any, weight due to his 44 felony convictions.  In fact, Vigoa's testimony would have brought to light

[158] Ex. 61, ECF No. 49-12 at 2.

[159] *Id.* at 3.

[160] *Id.* at 60–61, 78.

[161] *Id.* at 95, 96.

[162] *Id.* at 100; *see also* Ex. 2, ECF No. 25-2 at 2 (affidavit of Vigoa stating that "[i]n furtherance of the conspiracy, Pedro Duarte, Oscar Cisneros and I committed [r]obberies at the MGM Grand Hotel on September 20, 1998[,] and at the Desert Inn Hotel on June 28, 1999.").

facts of the other robberies. Therefore, Vigoa's testimony would not have added anything beneficial to Duarte's defense, and indeed, would have been more detrimental.[163]

Accordingly, I conclude that Duarte's trial counsel's failure to call Farray or Vigoa to testify did not "f[a]ll below an objective standard of reasonableness."[164] The Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence.[165] Ground 4a is denied.

### 5. **Ground 4b**

In Ground 4b, Duarte claims that his federal constitutional rights were violated when his trial counsel failed to conduct an independent DNA test of the Arrowhead water bottle.[166] This ground was raised in Duarte's state habeas appeal.[167] The Nevada Supreme Court rejected this ground, reasoning that, "[a]ssuming, without deciding, that trial counsel was deficient in not independently testing frozen DNA cells, Duarte failed to demonstrate that the retesting of the DNA evidence would have had a reasonable probability of exonerating him, and thus, he failed

---

[163] *See United States v. Balzano*, 916 F.2d 1273, 1294 (7th Cir. 1990) ("The Constitution does not oblige counsel to present each and every witness that is suggested to him. In fact, such tactics would be considered dilatory unless the attorney and the court believe the witness will add competent, admissible and non-cumulative testimony to the trial record."); *see also Lewis v. Mazurkiewicz*, 915 F.2d 106, 113 (3d Cir. 1990) ("[T]rial counsel [is] not bound by an inflexible constitutional command to interview every possible witness"; rather, "counsel [is] simply required to exercise reasonable professional judgment in deciding" who to interview).

[164] *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

[165] *See* 28 U.S.C. § 2254(d) (1996).

[166] ECF No. 47 at 28.

[167] Ex. 20, ECF No. 26-1 at 72.

to demonstrate that he was prejudiced."[168]  The Nevada Supreme Court then restated its holding in Duarte's direct appeal: "[t]he DNA expert who recovered the saliva testified that submerging the mouthpiece in fluid was the most effective DNA extraction method.  Furthermore, the PCR test, the manner of DNA testing used by the State's expert, has been shown to be 'reliable and trustworthy for use within the forensic context.'"[169]

I find that this ruling to be reasonable.  As explained *supra*, Duarte moved for independent DNA testing of the Arrowhead water bottle, and that motion was granted.  On the morning of the first day of trial, Duarte filed a motion requesting that the water bottle DNA be suppressed because retesting of the water bottle was impossible.[170]  Wahl, a DNA Analyst with the Las Vegas Metropolitan Police Department, found that Duarte was the source of the DNA found on the water bottle.[171]  Wahl testified that he told Duarte's expert that she would probably be unsuccessful in recovering any DNA from the water bottle.[172]  However, Wahl testified that the unused DNA that was extracted from the water bottle was frozen and available to be retested.[173]

Although Duarte's expert was told by the State's expert that she probably would be unsuccessful in retesting the DNA found on the water bottle, it is unclear why Duarte's counsel

---

[168] Ex. 24, ECF No. 26-2 at 87–88.

[169] *Id.* at 88.

[170] Ex. 45, ECF No. 48-6 at 8, 10.

[171] Ex. 50, ECF No. 49-1 at 135, 135–36.

[172] *Id.* at 149–50.

[173] *Id.* at 143.

did not instruct her to perform her own testing to be sure. It is also unclear why Duarte's trial

counsel did not want to test the frozen DNA that was extracted from the water bottle by Wahl.

Without answers to these questions, it is difficult to assess whether Duarte's trial counsel was

deficient. In fact, it may have been a strategic decision to not retest the water bottle or frozen

DNA.[174]

Regardless of whether Duarte's trial counsel was deficient in this regard, however,

Duarte must also demonstrate that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."[175] Duarte cannot

meet this burden. There is no evidence that a retest of the water bottle would have shown that

the DNA belonged to anyone but Duarte.[176] Accordingly, because Duarte has failed to show

prejudice, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable

application of, clearly established federal law as determined by the Supreme Court, nor was it

based on an unreasonable determination of the facts in light of the evidence.[177] Ground 4b is

denied.

---

[174] *See, e.g., Jackson v. Conway*, 763 F.3d 115, 154 (2d Cir. 2014) ("[C]ounsel could have refrained from calling a medical expert for a valid strategic reason: fear of the concessions the State may have been able to extract from that expert on cross-examination."); *Moeller v. Weber*, 649 F.3d 839, 847 (8th Cir. 2011) (counsel's failure to test the state's evidence was reasonable, as counsel's theory was that the state's expert was mistaken and counsel challenged the evidence through this argument); *Skinner v. Quarterman*, 576 F.3d 214, 219 (5th Cir. 2009) (counsel was not deficient for failing to conduct DNA tests of crime scene evidence because there was a risk that such testing would reveal that the DNA belonged to the defendant).

[175] *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

[176] *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation.").

[177] *See* 28 U.S.C. § 2254(d) (1996).

## 6.    *Ground 4c*

In Ground 4c, Duarte claims that his federal constitutional rights were violated when his trial counsel failed to retained a fingerprint expert and a DNA expert to refute and explore problems with the methods used by the State's DNA expert.[178]  This ground was raised in Duarte's state habeas appeal.[179]  The Nevada Supreme Court found that "Duarte failed to demonstrate that his trial . . . counsel [was] ineffective."[180]  As this ground was denied on the merits by the Nevada Supreme Court without analysis, the question here is whether Duarte has shown that there was no reasonable basis for the Nevada Supreme Court's ruling.[181]

Although a DNA expert may have been able to articulate scientific issues regarding the State's DNA expert's method of extracting DNA, Duarte's counsel successfully cross-examined the State's DNA expert.  In fact, Duarte's trial counsel highlighted several concerns during his cross-examination: a mistake in the expert's report, a mistake made by the State's laboratory in a different case that caused an individual to be wrongfully charged, the fact that the PVS method of DNA extraction potentially rendered it impossible to extract DNA off the water bottle at a later date, and the fact that the expert was not accredited at the time that he conducted the analysis of the water bottle.[182]  Therefore, because Duarte was able to identify concerns with the

---

[178] ECF No. 47 at 29–30.

[179] Ex. 20, ECF No. 26-1 at 74.

[180] Ex. 24, ECF No. 26-2 at 89 n.6.

[181] *See Harrington v. Richter*, 562 U.S. 86, 98 (2011).

[182] Ex. 50, ECF No. 49-1 at 145–46, 149–51, 159.

State's DNA expert through cross-examination, I cannot determine that Duarte's trial counsel was deficient for failing to call his own expert witness to accomplish the same task.[183]

I turn now to the issue of Joel Geller, a fingerprint expert with the Las Vegas Metropolitan Police Department, who examined a fingerprint recovered from the stolen California license plate and determined that it belonged to Duarte.[184] Duarte presents no evidence to support his conclusory assertion that his own fingerprint expert would have been helpful to his defense or would have been able to discredit Geller's findings.[185] There is also no requirement that Duarte present an expert witness based entirely on the fact that the State presented an expert witness.[186] Finally, Duarte's trial counsel testified at the post-conviction hearing that he did consult with a fingerprint expert[187] because "there was fingerprint evidence in the case that needed to be examined and that's what he was brought to do."[188] Because Duarte's trial counsel had the fingerprints analyzed by his expert and thereafter decided to not call him as a witness, it is presumed that the results of the fingerprint analysis were not helpful to Duarte's

---

[183] *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *see also Harrington*, 562 U.S. at 111 ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation.").

[184] Ex. 50, ECF No. 49-1 at 4, 6, 10–11.

[185] *See Harrington*, 562 U.S. at 107 (2011) ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

[186] *See id.* at 111 ("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.").

[187] Ex. 31, ECF No. 26-3 at 77.

[188] *Id.* at 80.

1  defense.  Accordingly, I find that Duarte's trial counsel was not deficient in failing to call a

2  fingerprint expert.[189]

3      Because Duarte has not established that his trial counsel was deficient in failing to call a

4  DNA expert or fingerprint expert, I conclude that the Nevada Supreme Court's ruling was not

5  contrary to, or an unreasonable application of, clearly established federal law as determined by

6  the Supreme Court, and it was not based on an unreasonable determination of the facts in light of

7  the evidence.[190]  Ground 4c is denied.

8      ### 7.    *Grounds 4d and 5a*

9      In Ground 4d, Duarte claims that his federal constitutional rights were violated when his

10  trial counsel failed to move for a mistrial when Uniformed Special Emergency Response Team

11  (hereinafter SERT) officers were present in the courtroom during his trial and when the jury

12  witnessed Duarte being handcuffed.  In Ground 5a, Duarte claims that his federal constitutional

13  rights were violated when his appellate counsel failed to include a ground in his direct appeal

14  concerning the SERT officers and handcuffing.[191]  The respondents argue that there was no

15  evidence that the jury saw Duarte in handcuffs and that Duarte provided no legal support to

16  suggest that uniformed officers simply being present in the courtroom is a violation of his due-

17  process rights.[192]

18

19

20  ───────────────────

[189] *Strickland*, 466 U.S. at 688.

21

[190] *See* 28 U.S.C. § 2254(d) (1996).

22

[191] ECF No. 47 at 30–31.

23

[192] ECF No. 74 at 27, 31.

These grounds were raised in Duarte's state habeas appeal.[193]  The Nevada Supreme

Court held that "Duarte failed to demonstrate that his trial and appellate counsel were

ineffective."[194]  As these grounds were denied on their merits by the Nevada Supreme Court

without analysis, the question here is whether Duarte has shown that there was no reasonable

basis for the Nevada Supreme Court's ruling.[195]   He has not.

Prior to voir dire, Duarte's trial counsel made a record about the security personnel

present in the courtroom.  Duarte's trial counsel pointed out that it was his understanding that

two SWAT officers were going to be seated directly behind Duarte.  He argued that this "is

something that ultimately could taint the jury and prejudice [Duarte] before we even have a jury

impaneled just by the whole jury pool sitting out here and seeing that."  The Court dismissed

Duarte's counsel's concerns:

> There'll be two officers here in their uniforms.  We always have two
> uniformed officers in the courtroom.  They'll be wearing slightly
> different uniforms, but they will be wearing uniforms nonetheless.
> We usually have them sitting within close proximity of the
> defendants.  I do not find that it would be unduly prejudicial to have
> them seat in the first row of the public seating behind the defense
> counsel's table.
>
> The need for security is not made by the Court; that's made by other
> individuals who have more reason to know whether or not there's a
> need in consultation with members of court administration.  That - -
> we've set it up that way so that I'm not privy to information you're
> not privy to, and they have made that determination that there is a
> need for security.  I therefore go along with it, and I again do not
> find that having two uniformed officers seated in the public seating

---

[193] Ex. 20, ECF No. 26-1 at 70.

[194] Ex. 24, ECF No. 26-2 at 89 n.6.

[195] *See Harrington v. Richter*, 562 U.S. 86, 98 (2011).

immediately behind defense counsel would unduly prejudice the defendant.[196]

After voir dire, Duarte's trial counsel made a record about the security personnel, pointing out that there was a SERT officer in police attire in the back of the courtroom, another officer in plain clothes, and three corrections officers. He argued that he did not "believe that the security that [was] in place . . . [was] justified." The state district court again dismissed those concerns:

> First of all, I have two officers in normal Court Services officers' uniform or Metro summer uniforms. They're sitting at the opposite ends of the first row. I have one uniformed officer at the back, by the back door. I have my court bailiff. I then have one who's in plainclothes who is not readily identifiable as an officer. I also have the officer in the green uniform who was not present during the vast majority of the jury selection. He will be coming in and out of the courtroom occasionally, but for the most part will remain outside the courtroom.
>
> And this has been done in consultation with my bailiff and Court Administration, who have made their own determination as to the need for security, as I previously pointed out. And when they tell me there's a need for security, I don't second guess that, because they have met, they have discussed it, they have their reasons.
>
> I have approved these security arrangements within the courtroom as far as the seating of the officers. I do not find that there's anything about that that would have any impact on the jurors' ability to be able to listen and decide this case fairly. In fact, I only have one more uniformed officer than what I normally have in the courtroom when I have someone who is in custody being tried.[197]

---

[196] Ex. 45, ECF No. 48-6 at 16–18.

[197] Ex. 45, ECF No. 48-6 at 124–27.

The right to a fair trial includes "the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'"[198] However, the United States Supreme Court has held that "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is [not] the sort of inherently prejudicial practice that . . . should be permitted only where justified by an essential state interest specific to each trial."[199] Rather, "[i]n view of the variety of ways in which such guards can be deployed, . . . a case-by-case approach is more appropriate."[200]

I do not find that the presence of the SERT officers or other security personnel was prejudicial or warrants a finding that Duarte's trial was unfair in violation of his constitutional rights. In addition to the two officers in court services uniforms and the bailiff—personnel who are present at a regular criminal trial—there was one uniformed officer in the back of the courtroom, one officer in plainclothes, and one officer in a green uniform who remained outside of the courtroom for most of the trial.[201] Because these three extra security personnel were unobtrusive, I determine that Duarte's counsel's "representation [did not] f[a]ll below an

---

[198] *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)).

[199] *Id.* at 568–69.

[200] *Id.* at 569.

[201] *See* Ex. 45, ECF No. 48-6 at 17–18; Ex. 45, ECF No. 48-6 at 126–27.

objective standard of reasonableness" in failing to move for a mistrial based on the security personnel present during his trial.[202]

   Duarte's argument that the jury saw him being handcuffed is unsupported. He offers no citation to the record for this occurrence because his trial counsel allegedly failed to make a record or move for a mistrial. "[T]he Constitution forbids the use of visible shackles . . . during the guilt phase, *unless* that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial."[203] This determination may "take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial."[204] Because there is no factual background regarding the alleged handcuffing incident, I cannot determine whether Duarte's counsel's "representation fell below an objective standard of reasonableness" in failing to move for a mistrial.[205]

   But even assuming that Duarte's trial counsel was deficient, Duarte cannot show prejudice.[206] Duarte only alleges that the jury saw him being handcuffed on one occasion. In a similar case, the United States Court of Appeals for the Eleventh Circuit reasoned that "[t]he fact

---

[202] *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

[203] *Deck v. Missouri*, 544 U.S. 622, 624 (2005) (emphasis in original) (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986)); *see also Illinois v. Allen*, 397 U.S. 337, 344 (1970) ("Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.").

[204] *Deck*, 544 U.S. at 629.

[205] *Strickland*, 466 U.S. at 688.

[206] *See Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008) ("To determine whether the imposition of physical restrains constitutes prejudicial error, we have considered the appearance and visibility of the restraining device, the nature of the crime with which the defendant was charged and the strength of the state's evidence against the defendant.").

that [the defendant] was unshackled for the great majority of the trial, including the entire time the jury was in the box hearing evidence and arguments, . . . weighs against a finding of prejudice."[207]  Accordingly, because there was sufficient evidence of guilt against Duarte—the fingerprint on the stolen license plate and his DNA on the Arrowhead water bottle found in the getaway vehicle—and because the alleged shackling only happened once at some undetermined point in the trial, I cannot determine that Duarte's counsel's failure to move for a mistrial prejudiced him such that "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[208]

Because I have determined that Duarte's trial counsel was not deficient in failing to move for a mistrial regarding the security personnel present during his trial and that there was no prejudice resulting from his trial counsel's failure to move for a mistrial regarding the alleged handcuffing incident, it cannot be determined that Duarte's appellate counsel was "objectively unreasonable" in not including these grounds in Duarte's direct appeal.[209]  Thus, the Nevada Supreme Court's rulings were not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, and they were not based on an

---

[207] *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1322–23 (11th Cir. 2016) (even assuming that defendant's factual background was accurate, and established that the defendant was shackled in front of the venire, counsel's failure to object was not prejudicial; at most jurors saw him in shackles for one day in a five-day trial, and given the overwhelming evidence of guilt there is no reasonable probability that the outcome would have been different).

[208] *Strickland*, 466 U.S. at 694; *see also Walker v. Martel*, 709 F.3d 925, 948–49 (9th Cir. 2013) (counsel's failure to object to shackles was not prejudicial; although the jury was aware of the restraint, it was relatively unobtrusive molded plastic brace placed on his leg under his clothing, and the government's evidence was strong).

[209] *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).

unreasonable determination of the facts in light of the evidence.[210]  Grounds 4d and 5a are denied.

### 8.    *Ground 5b*[211]

In Ground 4e, Duarte claims that his federal constitutional rights were violated when his appellate counsel failed to raise a *Batson* issue on appeal.  Duarte explains that the State struck Hispanic jurors, and the state district court failed to examine whether the State's proffered race-neutral explanations were a pretext for discrimination.[212]  In my August 23, 2016, order, I found that Ground 5b was not presented to the Nevada Supreme Court.[213]  I held that Duarte may be able to show good cause for his failure to exhaust this ground under *Martinez v. Ryan*.[214]  Because the *Martinez* analysis is intertwined with the underlying merits of this claim, I denied the motion to dismiss without prejudice and deferred ruling on the *Martinez* issue until the merits

---

[210] *See* 28 U.S.C. § 2254(d) (1996).

[211] I previously determined that this ground relates back to Duarte's timely-filed initial petition and is not time barred.  *See* ECF No. 68 at 9.

[212] ECF No. 47 at 32.

[213] ECF No. 68 at 9; *see also Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991) ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petition who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance.").

[214] ECF No. 68 at 9; *see Murray v. Carrier*, 477 U.S. 478, 496 (1986) (holding that where a procedural default constitutes an adequate and independent state ground for denial of habeas corpus, the default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it); *see also Martinez v. Ryan*, 566 U.S. 1, 9 (2012) (discussion *supra* at pp. 20–21).

of this ground were briefed.[215]  I now determine that this ground is not substantial and lacks

merit because Duarte has not shown that his appellate counsel was deficient.

The State exercised two of its peremptory challenges on Victor Solorzano and Cecelia

Camacho.[216]  Ms. Camacho did not answer any questions posed during voir dire, and Mr.

Solorzano only stated that he speaks Spanish and that he "do[es] understand, and I speak well,

but I have problem to write my English.  But I don't feel a hundred perfect, you know."[217]

Duarte's counsel raised a challenge under *Batson v. Kentucky*[218]:

> [I]t's my position, first of all, that those were the only two Hispanics
> or of some - - of Hispanic descent on the jury.  There was no
> questions asked of either of these individuals as far as whether or
> not - - from the State's position anyway, whether or not they could
> be a fair or impartial juror or any questioning whatsoever to
> determine whether or not they in fact could sit fairly and impartially
> on this jury and be fair to the State of Nevada in this case.  The fact
> that they were the only two Hispanics on this jury and the fact that
> there were no questions that raised any issue as far as their ability to
> be fair and impartial, in my opinion the challenge was solely based
> on their race.  As such, it's a violation of *Batson*, and we would
> challenge it on those grounds, Your honor.[219]

The State then explained its challenges:

> With regard to Ms. Camacho, she was a young juror, she was not
> interactive through the whole process.  She didn't answer any
> questions that I posed, she didn't answer any questions that [co-
> counsel for the State] posed, and she didn't react to any questions

---

[215] ECF No. 68 at 9.

[216] Ex. 45, ECF No. 48-6 at 117.

[217] *Id.* at 99.

[218] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[219] *Id.* at 122.

that [Duarte's trial counsel] posed. She didn't answer anything during the entire process and sat there with a blank stare on her face.

Mr. Solorzano, he spoke to the Court and discussed that he had a language barrier, he had trouble reading English. And when he was speaking with the Court, he actually had trouble speaking English, as well. So that was the reason that he was kicked.

I'd also note for the Court and take issue with [Duarte's trial counsel]'s statement that we did not leave anyone with Hispanic or a Latin American descent on the juror - - on the jury. I believe Mr. Nieves is of Latin American descent, I believe Ms. Rockmaker is of Latin American descent, and possibly Ms. Cahill. Those people were all left on the panel and actually are all sitting jurors in this case. I don't believe the defense has established that there was a pattern, and the State has offered this Court a completely race-neutral reason for challenging both of these potential jurors in this case.[220]

The Court found that the State had provided race-neutral reasons for these strikes:

All right. The Court does note that there does appear more - - to be more jurors who may be of Hispanic background on the jury and that they have given - - the State has provided race-neutral reasons for asking that the two jurors be excused. In fact, the Court would note that the Court had some reservation about Mr. Solorzano remaining on the jury. He did appear to have some difficulty in expressing himself in the language. And for those reasons the *Batson* challenge in denied.[221]

The use of a peremptory challenge to remove a prospective juror because of race violates the federal constitution.[222] Under *Batson* and its progeny, consideration of a defendant's challenge to a peremptory strike involves a three-step analysis:

---

[220] *Id.* at 122–23.

[221] *Id.* at 124.

[222] *See J.E.B. v. Alabama ex. rel. T.B.*, 511 U.S. 127, 129 (1994); *Powers v. Ohio*, 499 U.S. 400, 409 (1991).

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecution to present a race-neutral explanation for striking the juror in question. . . . Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.[223]

Duarte appears to only take issue with the state district court's performance of step three.[224] "[T]he critical question in determining whether a [petitioner] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike."[225] The issue comes down to credibility, and "[c]redibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."[226] A trial court's determination is a question of fact.[227] Therefore, Duarte must demonstrate that the state district court's conclusion on the *Batson* challenge constituted "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[228]

---

[223] *Rice v. Collins*, 546 U.S. 333, 338 (2006).

[224] *See* ECF No. 47 at 32.

[225] *Miller-El v. Cockrell*, 537 U.S. 322, 338–39 (2003).

[226] *Id.* at 339; *see also Thomas v. Moore*, 866 F.2d 803, 805 (5th Cir. 1989) ("Determining whether a prosecutor has acted discriminatorily in his use of a peremptory challenge depends greatly upon the observations of the presiding judge.").

[227] *See Flowers v. Mississippi*, 136 S. Ct. 2157, 2158 (2016); *Hernandez v. New York*, 500 U.S. 352, 364 (1991).

[228] 28 U.S.C. § 2254(d)(2); *see Rice*, 546 U.S. at 338.

The State explained that it used its peremptory challenge to excuse Ms. Camacho because she was young, not interactive, and had a blank stare during voir dire.[229]  And the State explained that it excused Mr. Solorzano because of his language barrier.[230]  The state district court then concluded that "the State has provided race-neutral reasons for asking that the two jurors be excused."[231]  I find that this conclusion of the state district court satisfies the third step of the peremptory-strike analysis: the state district court made a determination that Duarte failed to show purposeful discrimination.[232]  Further, because an inattentive juror and a juror who may have difficulties understanding the proceedings are legitimate concerns unrelated to race, I cannot say that the state district court's acceptance of the prosecutor's race-neutral explanations regarding Ms. Camacho and Mr. Solorzano was unreasonable.[233]

Because the state district court satisfied the third step of the peremptory-strike analysis, Duarte has not shown that his appellate counsel's "representation fell below an objective standard of reasonableness" when he failed to include this *Batson* issue in his direct appeal.[234]  Accordingly, because Duarte has not shown this ground of ineffective assistance of appellate

---

[229] Ex. 45, ECF No. 48-6 at 122–23.

[230] *Id.* at 123.

[231] *Id.* at 124.

[232] *See Rice*, 546 U.S. at 338.

[233] *Id.*

[234] *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

counsel to be substantial, there is no cause for Duarte's procedural default.[235]  Therefore, I deny Ground 5b because it is procedurally defaulted.

**C.      Certificate of Appealability**

The right to appeal from the district court's denial of a federal habeas petition requires a certificate of appealability.  To obtain that certificate, the petitioner must make a "substantial showing of the denial of a constitutional right."[236]  "Where a district court has rejected the constitutional claims on the merits," that showing "is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[237]  Because I have rejected Duarte's constitutional claims on their merits, and Duarte has not shown that this assessment of his claims is debatable or wrong, I find that a certificate of appealability is unwarranted in this case.

**Conclusion**

IT IS HEREBY ORDERED that the Second Amended Petition for Writ of Habeas Corpus by a Person in State Custody Pursuant to 28 U.S.C. § 2254 **[ECF No. 47] is DENIED**.

IT IS FURTHER ORDERED that Petitioner is **denied a certificate of appealability**.

The Clerk of the Court is directed to ENTER JUDGMENT accordingly and CLOSE THIS CASE.

Dated: September 30, 2019           _____
                                    U.S. District Judge Jennifer A. Dorsey

---

[235] *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012) ("Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial.").

[236] 28 U.S.C. § 2253(c) (1996).

[237] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).